IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION AT CHATTANOOGA



TENNESSEE CHURCH OF GOD,	)
	)	1:07-cv-47
	)
	Plaintiff,	)	Case No. Collier
	)	District Judge Lee
	)
vs.	)
	)
GENWORTH LIFE AND HEALTH	)
INSURANCE COMPANY, and	)
GENWORTH FINANCIAL, INC.	)
	)
	)
	)
	Defendants.	)

## COMPLAINT

Plaintiff, Tennessee Church of God ("TCG"), states to the Court as follows:

### THE PARTIES

1. TCG is an unincorporated religious association, with its office (and therefore, in the secular world, its "principal place of business") located in Chattanooga, Tennessee. TCG is affiliated with the Church of God, which is a Tennessee not for profit corporation and religious denomination headquartered in Cleveland, Tennessee.

2. Genworth Financial, Inc. ("Genworth") is a Delaware entity, with its principal place of business located in Richmond, Virginia. Genworth is an insurance provider doing business in Tennessee. Genworth may be served through its registered agent, Corporation Service Company, located at 2908 Poston Avenue, Nashville, TN 37203.

1

3. Defendant Genworth Life and Health Insurance Company ("Genworth Life and Health"), formerly known as GE Group Life Assurance Company, is a Connecticut entity, with its principal place of business located in Windsor, Connecticut. Genworth Life and Health is an insurance provider doing business in Tennessee. Genworth Life and Health may be served through its registered agent, Corporation Service Corporation, located at 2908 Poston Avenue, Nashville, TN 37203. For purposes of this Complaint, unless otherwise noted, the term "Genworth" will refer to both Genworth and Genworth Life and Health.

4. Upon information and belief, Genworth was previously owned by GE Financial Assurance Holdings, Inc. ("GE Financial"). Based on the publicly available records, it appears that GE Financial reduced its stock ownership in Genworth to less than fifty percent between the years of 2003 and 2006. Also upon information and belief, prior to the time of the events giving rise to this suit, GE Financial and its subsidiary companies were subsumed by Genworth, and Genworth assumed GE Financial's liabilities and obligations. Consequently, GE Financial and its subsidiaries no longer exist as separate corporate entities subject to suit.

## JURISDICTION

5. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, as this controversy involves citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Venue is proper pursuant to 28 U.S.C. § 1391 because this case is brought where a substantial part of the events or omissions giving rise to the claim occurred.

# FACTS

7. This lawsuit concerns the circumstances of Genworth's providing a Stop Loss Insurance policy ("Stop Loss policy") to TCG for the ultimate benefit of credentialed ministers (and their dependents) serving Tennessee Church of God churches, and Genworth's subsequent refusal to honor the Stop Loss policy. The Stop Loss policy was effective November 1, 2005.

8. In or about the summer of 2005, TCG, through Creative Financial Planning, Inc. ("CFPI"), a broker, and Capitol Administrators of the Southeast, LLC. ("Capitol"), a third-party administrator, began to seek alternative health insurance options different from its existing insurance coverage. TCG sought to evaluate alternatives to the health care plan that it was offering to credentialed ministers (and their dependents) serving Church of God churches in Tennessee.

9. Genworth indicated to Capitol that it could provide insurance to meet TCG's needs.

10. As part of its underwriting, Genworth asked Capitol for certain information about the people who would be insured under the Stop Loss policy.

11. On or about August 29, 2005, CFPI and Capitol provided Genworth the information they had available concerning health claims in the previous year, including detailed claims information from Blue Cross / Blue Shield. Later, a "Transferred Business Report" ("TBR") that listed three (3) individuals who had received more than $20,000 in medical benefits during the prior twelve months was submitted to Genworth. The data used to complete the TBR was from TCG's prior insurance carrier that had been previously supplied to Genworth.

3

12. Only one of the individuals included on the TBR is listed by name. The names of the other two individuals were unknown to CFPI, Capitol, and the person who signed the TBR on behalf of TCG.

13. The TBR indicates that one person suffered from an "intestinal fistula" and had claims paid during the prior twelve months of "$80,083." On the TBR, the "Name & Status of Participant (EE/Dep/COBRA/Retiree)" of this person is given as "unknown." For the "Prognosis/treatment plan" applicable to this person on the TBR, TCG indicated that such information was "unknown." These disclosures were true and correct.

14. TCG provided the information requested in the TBR on or about October 31, 2005.

15. TCG relied on the representations made by Genworth during the application process that the Stop Loss Policy would cover all of the intended insureds.

16. It was reasonable and justifiable for TCG to rely on Genworth because Genworth is a sophisticated and experienced insurance provider.

17. TCG acted in good faith during the application process.

18. On the TBR, TCG indicated that the "proposed effective date" for the Stop Loss policy is "11/1/05."

19. After receiving the TBR, Genworth did not ask TCG for any more information from TCG about the health status of the insureds. Indeed, Genworth's representative expressly approved the TBR as submitted.

4

20. Other than for one individual included by name on the TBR, Genworth did not indicate that the other individuals included on the TBR would be subject to particularized deductibles, higher premiums, or otherwise special treatment.

21. After receiving the TBR, Genworth did not ask TCG for more time to evaluate TCG's application for insurance.

22. After receiving the TBR, and despite Genworth's not having the name of the person with the intestinal fistula, the "status" of this person, or this person's "prognosis/treatment plan," Genworth did not ask for any more information about this person.

23. On or about November 2, 2005, Genworth sent a letter to CFPI, which states, among other things, "We are pleased to inform you that your firm's request for Stop Loss Insurance has been approved effective November 1, 2005." This approval was communicated to TCG.

24. TCG reasonably and justifiably relied on Genworth's letter dated November 2, 2005, for the belief that it had in place a Stop Loss policy that would cover its needs and those of the ministers and dependents that elected to participate in the health care plan.

25. The ministers in the TCG plan, through Capitol, paid Genworth the premiums and fees as due under the Stop Loss Policy.

26. Based on its understanding that it had sufficient coverage under the Genworth Stop Loss Policy, TCG did not seek additional or different insurance coverage.

27. It was reasonable, justifiable, and appropriate for TCG to rely on Genworth during the application process and upon Genworth's representations about coverage.

28. Beginning in late 2005, and continuing into 2006, TCG submitted claims to Genworth on behalf of the wife of a minister properly covered under the insurance plan. The names of the minister and his wife are not revealed herein out of respect for their privacy, but their names are well known to the Defendants. She will be referred to herein as "Patient."

29. Later, it became known to TCG that Patient was the person disclosed on the TBR and the Blue Cross / Blue Shield report referenced above as having an intestinal fistula.

30. Patient qualifies for coverage under the Stop Loss Policy.

31. Genworth first denied claims related to Patient on or about March 1, 2006, when, by letter, Genworth informed TCG for the first time that "[a]n issue has arisen regarding the underwriting of this account."

32. Despite having issued the Stop Loss policy, and despite not having attached any particular higher deductible, higher premiums, exclusions, or otherwise special treatment applicable to Patient prior to issuing the Stop Loss Policy, Genworth failed to honor her claims.

33. The claims for necessary and reasonable care to treat Patient during the term of the policy issued by Defendants total at least $550,000.

34. Genworth has provided various, evolving reasons why it has denied the claims related to Patient. The refusal to pay is without basis in fact or law.

35. TCG repeatedly has asked Genworth to reconsider its decisions not to pay the claims related to Patient. Genworth has refused to do so.

36. Genworth's failure to approve the claims related to Patient has caused harm to TCG because it has been required to pay the medical expenses of Patient that Genworth has refused to pay.

## COUNT I - BREACH OF CONTRACT

37. TCG incorporates by reference the allegations of paragraphs 1 through 36 of this Complaint as if fully set forth herein.

38. Genworth agreed to provide a Stop Loss Policy to TCG.

39. Patient, as an insured dependent under the Stop Loss Policy, qualifies for insurance coverage.

40. TCG timely submitted claims to Capitol related to Patient. Capitol timely submitted Patient's claims to Genworth.

41. Genworth has denied Patient's claims in breach of the Stop Loss Policy.

42. TCG has been harmed by Genworth's failure to meet its obligations under the Stop Loss Policy in an amount to be proven at trial.

## COUNT II - BREACH OF IMPLIED CONTRACT – UNJUST ENRICHMENT

43. TCG incorporates by reference the allegations of paragraphs 1 through 42 of this Complaint as if fully set forth herein.

44. By its performance in reliance on Genworth's promises, the participants in the TCG health insurance plan incurred substantial expenses (by paying premiums) and TCG did business with Genworth rather than another insurer. This conferred substantial benefits upon Genworth.

45. Genworth not only appreciated and accepted the benefits conferred by TCG's performance but actively encouraged and participated in that performance.

46. It is inequitable for Genworth to have represented to TCG that Genworth would provide adequate insurance, for Genworth to receive the health claims information it did on the TBR and from other sources, for Genworth not to ask TCG for any additional information related to the TBR, for Genworth to approve the TBR, for Genworth to issue TCG the Stop Loss Policy, and for Genworth to accept premium payments, but then for Genworth to deny the claims related to Patient.

47. As a direct result of Genworth's unfair conduct, Genworth has been unjustly enriched in an amount to be proven at trial.

## COUNT III - EQUITABLE ESTOPPEL

48. TCG incorporates by reference the allegations of paragraphs 1 through 47 of this Complaint as if fully set forth herein.

49. In the alternative, Genworth is equitably estopped from asserting that the Stop Loss Policy does not cover claims related to Patient.

50. It is inequitable for Genworth to have represented to TCG that Genworth would provide adequate insurance, for Genworth to receive the health claims information it did on the TBR and from other sources, for Genworth not to ask TCG for any additional information related to the TBR, for Genworth to approve the TBR, for Genworth to issue TCG the Stop Loss Policy and related documents indicating the presence of insurance coverage, and for Genworth to accept premium payments, but then for Genworth to deny the claims related to Patient.

51. As a direct result of Genworth's inequitable and unfair conduct, TCG has been denied the opportunity to secure insurance that would cover the claims related to Patient. TCG has been damaged in an amount to be proven at trial.

### COUNT IV - PROMISSORY ESTOPPEL - DETRIMENTAL RELIANCE

52. TCG incorporates by reference the allegations of paragraphs 1 through 51 of this Complaint as if fully set forth herein.

53. Genworth induced TCG to forbear in a definite and substantial character. Based on Genworth's representations about the Stop Loss Policy and its issuance of the Stop Loss Policy as described above, TCG did not seek insurance from another source, and the ministers and their dependents who participated in the TCG plan paid premiums to Genworth understanding and believing that they had the coverage they needed and had a right to expect.

54. Genworth should be estopped from denying coverage of claims related to Patient.

55. With Genworth's knowledge and encouragement, TCG did in fact reasonably rely upon Genworth's promises to TCG's detriment.

56. Injustice can be avoided only by the enforcement of the promise to pay Patient's claims.

57. TCG has been damaged in an amount to be proven at trial.

### COUNT V - NEGLIGENT MISREPRESENTATION

58. TCG incorporates by reference the allegations of paragraphs 1 through 57 of this Complaint as if fully set forth herein.

9

59. Genworth was acting in the course of its business, and in a transaction in which it had a pecuniary interest, when it conveyed information to TCG concerning the Stop Loss policy.

60. As set forth for specifically above, Genworth supplied faulty information to TCG that was meant to guide TCG in its business transactions.

61. Genworth failed to exercise reasonable care or competence in obtaining or communicating information regarding the Stop Loss policy.

62. TCG justifiably relied on the information supplied to it by Genworth regarding the Stop Loss policy.

63. As a result of Genworth's negligent misrepresentations, TCG has been damaged in an amount to be proven at trial.

## COUNT VI - TENNESSEE CONSUMER PROTECTION ACT

64. TCG incorporates by reference the allegations of paragraphs 1 through 63 of this Complaint as if fully set forth herein.

65. TCG is a "person" within the meaning of the Tennessee Consumer Protection Act, T.C.A. § 47-18-101, et. seq. and thus has standing to bring a TCPA claim. A stated purpose of the Tennessee Consumer Protection Act is, "To protect consumers and legitimate business enterprises from those who engage in unfair and deceptive acts or practices . . . ."

66. Genworth engaged in unfair and deceptive acts or practices. Among other things, Genworth represented to TCG that Genworth could provide adequate insurance, fully aware of the information in the claims history report and the TBR (which is expressly approved). Then Genworth issued TCG the Stop Loss Policy and accepted

10

TCG's premium payments, but then denied the claims related to Patient for reasons not based in law or fact.

67. Genworth's deceptive acts or practices caused TCG to suffer an ascertainable loss when it paid those bills for Patient. Genworth's deceptive acts were willful and knowing. TCG is entitled to treble damages and attorney's fees.

### COUNT VII – LACK OF GOOD FAITH REFUSAL TO PAY

68. TCG incorporates by reference the allegations of paragraphs 1 through 67 of this Complaint as if fully set forth herein.

69. TCG made a demand for payment of Patient's claims more than sixty days prior to the filing of this Complaint.

70. For the reasons indicated above, Genworth's refusal to pay the claims related to Patient was not in good faith as required by Tennessee law.

71. Genworth's failure to pay the claims related to Patient inflicted additional expenses, including attorney fees, on TCG.

72. Pursuant to T.C.A. § 56-7-105, Genworth is liable to TCG for the amount of the unpaid claims, as well as an additional sum not to exceed twenty-five percent of the liability for the damages incurred by TCG.

## COUNT VIII – COMMON LAW BAD FAITH

73. TCG incorporates by reference the allegations of paragraphs 1 through 72 of this Complaint as if fully set forth herein.

74. Genworth failed to reasonably investigate the claims of Patient. A reasonable investigation would have demonstrated that the claims were valid and that there was no basis in fact or law to deny payment of them. Indeed, information in Genworth's possession indicated no reasonable basis for denying payment of the claims.

75. Genworth's refusal to pay the claims of Patient was the result of more than a mere mistake in judgment on the part of Genworth. Rather, Genworth acted in bad faith in refusing to pay the claims of Patient in that the denial of the claims was not based in fact or law.

76. As a result of Genworth's bad faith, TCG has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff respectfully requests the following relief:

1. A trial by jury;

2. Judgment against the Defendants, jointly and severally, in the full amount of the damages proven at trial in an amount that will exceed $75,000, exclusive of interest and costs;

3. Treble damages pursuant to T.C.A. § 47-18-109 (TCPA);

4. An award of punitive damages under the bad faith claim in an amount necessary to punish the Defendants, and each of them, and to deter them and others from

12

committing such acts in the future;

     5.     A twenty-five percent penalty under T.C.A. §56-7-105 claim.

     6.     Attorneys' fees and costs under the TCPA claim;

     7.     Court costs;

     8.     Pre-judgment interest; and

     9.     Such other relief as the Court deems appropriate.

Respectfully submitted,

_____
John A. Day (TN BPR #9416)
**Branham & Day, P.C.**
5300 Maryland Way, Suite 300
Brentwood, TN 37027
(615) 742-4880
(615) 742-4881

Attorney for the Plaintiff

13